IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

CHARLES LEE BRICE,

                Petitioner,

v.                                          Docket No. 2:06cr154

UNITED STATES OF AMERICA,

                Respondent.

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT AND 18 U.S.C. §3582(C)(1)(A)

FCI Fort Dix has been one of the most severely impacted Bureau of Prisons' facilities in the United States during the COVID-19 pandemic. There have been two major outbreaks, yet the facility's protocols remain unchanged, with testing rates abysmal and a positivity rate over 72 percent. As a result of his incarceration at Fort Dix, Charles Brice is at risk for potentially fatal COVID-19-related health complications or death.

Through counsel, Mr. Brice now respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). This motion should be granted because Mr. Brice's COVID-19 infection, combined with the continued risk of reinfection and his medical risks, present an "extraordinary and compelling reason" for compassionate release.

### FACTUAL BACKGROUND

On February 27, 2007, Mr. Brice pled guilty to sexual exploitation of a minor, in violation of 18 U.S.C. §§ 2251(a) and 2251(e). On June 22, 2007, the Court sentenced Mr. Brice to 360 months' imprisonment with lifetime supervised release. ECF No. 30.

Mr. Brice is currently incarcerated at FCI Fort Dix, and his release date is July 4, 2032. Mr. Brice has been incarcerated since November 15, 2006, putting the length of his imprisonment at

over 14 years. ECF No. 60, p. 1. Accounting for good time credit, he has served over half of his sentence.

## ARGUMENT

### I.  The Court has jurisdiction to grant Mr. Brice's immediate release.

Mr. Brice satisfies § 3582(c)'s 30-day waiting period. A defendant may file a motion for compassionate release when he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden's facility, *whichever is earlier*[.]" First Step Act of 2018, §603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added). Congress selected this exceptionally short 30-day waiting period in order to expedite defendants' access to the courts and the court's consideration of compassionate release motions. *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

On November 1, 2020, Mr. Brice submitted his request for compassionate release to the warden at Fort Dix, which was denied by the warden on November 23, 2020. This Court and others around the country have found that the exhaustion requirement is satisfied upon the passage of thirty days since a prisoner's request for compassionate release, regardless of whether the BOP issues a denial of the request in the meantime.[1] It is the "official position of the Department of

---

[1] *See, e.g., United States v. Wilson*, Case No. 2:11cr180, Dkt. No. 663, at 4-5 (E.D. Va. May 29, 2020) (J. Jackson) (finding exhaustion satisfied where defendant submitted request for compassionate release to the warden on March 27, 2020, which was subsequently denied on April 10, 2020, within the 30 days of the request); *United States v. Latney*, Case No. 1:19cr202. Dkt. No. 36, at 4, n.4 (E.D. Va. June 2, 2020) (J. Trenga); *United States v. Robinson*, Case No. 3:10cr261, Dkt. No. 86, at 8 (E.D. Va. July 17, 2020) (J. Lauck); *United States v. Geister*, Case No. 2:10cr127, Dkt. No. 52, at 3-4 (E.D. Va. Aug. 14, 2020) (J. Allen); *United States v. Ray*, Case No. 1:18cr177, Dkt. No. 33, at 1 (E.D. Va. Aug. 17, 2020) (J. Brinkema); *United States v. McCoy*, Case No. 3:14cr44. Dkt. No. 165 at 8 (E.D. Va. Sept. 8, 2020) (J. Novak) ("Defendant submitted a request for compassionate release to the warden . . . on April 9, 2020, and received a denial letter on April 17, 2020. . . . Accordingly, the Court finds that Defendant has exhausted the administrative remedies outlined under § 3582(c)(1)(A) and that the Court has jurisdiction to consider the merits of Defendant's Motions."); *United States v. Seck*, Case No. 1:15cr221, Dkt. No. 69 at 4 (E.D. Va. Oct. 9, 2020) (finding that prior decisions on the issue are no longer controlling, and holding that the "the Court is guided by the plain text of the statute,

2

Justice and the Bureau of Prisons [that]: a defendant can file a motion for compassionate release in district court 30 days after requesting relief from the Warden, even if the Warden denies the relief within 30 days."[2] The government has uniformly adopted this position as well, stating that "[b]ecause the exhaustion requirement in § 3582(c)(1)(A) is satisfied by two alternative means, and an inmate may file 'whichever' of these means is completed first, a defendant may rely on the 30-day period even if the administrative appeals process is not complete." Response of the United States to the Court's October 28, 2020 Order, *United States v. Bowens*, No. 3:98cr110, Dkt. No. 321, at *3 (E.D. Va. Nov. 6, 2020).[3]

The language of the compassionate release statute and the Program Statement issued by the BOP itself also support this interpretation. *See* 18 U.S.C. § 3582(c)(1)(A). A petitioner may bring a motion to modify his sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*.") (emphasis

---

which only requires a Defendant to wait for 'the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility' before filing a compassionate release motion.") (J. O'Grady).

[2] *See* Gov't Supplemental Response to Def. Mtn. for Compassionate Release, *United States v. Andre Woodson,* 1:13-cr-20180-CMA, ECF No. 402 at 2 (S.D.Fl. June 5, 2020); *see also* Brief for the United States*, US v. Alam*, 20-1298, at 24 (6th Cir. Apr. 16, 2020); Brief of the United States, *US v. Millage*, 20-30086, at 14 n. 14 (9th Cir. Apr. 24, 2020); Government Response, *US v. Stephens*, 3:10-cr-00210-WHR, at 8 (S.D. Oh. May 6, 2020); Govt Opposition, *US v. Carter*, 1:16-cr-00156-TSC, at 16 n. 9 (D.D.C. May 4, 2020); Government's Letter, *US v. Meli*, 1:17-cr-00127-KMW (S.D.N.Y May 1, 2020); Govt Response, *US v. Robinson*, 3:18-cr-00597-RS, at 3 (N.D. Cal. Apr. 24, 2020); Answer, *Wilson v. Williams*, 4:20-cv-00794-JG, ECF 10, at 12-13, ECR 10-2 at ¶5 (N.D. Oh. Apr. 17, 2020).

[3] *See also* Response of the United States to Defendant's Briefing on Exhaustion, *United States v. Kimbrough*, No. 3:09cr220, Dkt. No. 82 at 3 (E.D. Va. Sept. 8, 2020) ("[T]he United States agrees with the defendant that the exhaustion requirement is satisfied upon the passage of thirty days since a prisoner's request for compassionate release, regardless of whether the BOP issues a denial of the request in the meantime.") (internal quotation marks omitted); United States' Response Opposing Defendant's Motion for Compassionate Release, *United States v. Smith*, No. 2:18cr96, Dkt. No. 37 at 12, n.5 (E.D. Va. Apr. 17, 2020) (conceding that "if the BOP rejects the request or takes no action within the 30 day window, the inmate is then free to press his position in the appropriate federal court"). United States' Response in Opposition to Defendant's Motion for Compassionate Release, *United States v. Zayas*, No. 1:19cr297, Dkt. No. 22 at 10-11 (E.D. Va. June 14, 2020).

added); U.S. Dept. of Justice, Fed. Bur. of Prisons, Program Statement 5050.50 (Jan. 19, 2020) ("Under 18 U.S.C. § 3582(c)(1), an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response under subparagraph (a), the denial from the General Counsel under subparagraph (d), *or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier.*") (emphasis added). Accordingly, Mr. Brice has satisfied the exhaustion requirement contained in 18 U.S.C. § 3582(c), and his motion is ripe for review.

## II. The Court has statutory authority to decide whether "extraordinary and compelling reasons" exist.

It is the Court, not BOP, that determines whether there are extraordinary and compelling reasons warranting relief under 18 U.S.C. § 3582(c)(1)(A). *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020). In fact, all appellate courts to have considered the issue have reached the same conclusion: "district courts are empowered to consider *any* extraordinary and compelling reason that a defendant might raise." *Id.* at 284 (emphasis in original) (internal quotations omitted); *see also United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020) (holding that § 1B1.13 is no longer an "applicable" policy statement that courts must consider because, pursuant to its express language, it only applies to motions brought by the BOP Director and not to motions brought by defendants themselves); *United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020) (same); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020) (same).

Ultimately, the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Brooker*, 2020 WL 5739712, at *7.

III.    **There are extraordinary and compelling reasons for release in this case.**

A.    Mr. Brice is not safe at FCI Fort Dix.

In determining whether compassionate release is appropriate, courts in this District consider a person's "particularized susceptibility and [] particularized risk of contracting the coronavirus." *United States v. Robinson*, 3:10cr261, ECF No. 86, at 7 (E.D.Va. July 17, 2020) (citing *United States v. White*, 2020 WL 3442171, *4 (E.D. Va. June 23, 2020)). Currently, there are 210 inmates and 35 staff who are positive for COVID-19 at Fort Dix, plus one inmate death, and nearly 1,500 in the facility have contracted the virus in the past year.[4]

The number of infected individuals at Fort Dix reported on BOP's website are bad enough, yet there is ample evidence that those numbers are not accurate and the real numbers are likely much higher. For example, on November 6, 2020, the BOP website showed FDC Philadelphia had 21 inmates and 4 staff with COVID-19. Ex. 2 at 13. The day before, however, the United States Attorney for the Eastern District of Pennsylvania told the court in a letter that on October 30, 2020, 50 additional inmates tested positive, for a total of 68 at that facility. *Id.* at 1. And that on November 6, there were four more positive cases, for a total of 72. *Id.* at 3. Even on November 12, 2020, the BOP website still stated that FDC Philadelphia had 27 inmates and 10 staff who were positive, refusing to acknowledge publicly the 72 positive cases despite providing those numbers to the United States Attorney's Office.[5] So, when the BOP represents 245 current cases among inmates and staff in Fort Dix, the reality could be much higher and more devastating.

The situation at Fort Dix is dire enough that it has prompted nationwide concern. After a second major coronavirus outbreak at Fort Dix, New Jersey members of Congress demanded that BOP stop all transfers in and out of Fort Dix, as well as to demand that BOP "immediately" test the more than 2,700 inmates and hundreds of staff members at the prison, as well as testing both groups on at least a bi-weekly basis. Ex. 1. The inclusion of mandatory staff testing is vital, since "the

---

[4] BOP, COVID-19, available at: https://www.bop.gov/coronavirus/ (last visited Feb. 8, 2021)

[5] https://www.bop.gov/coronavirus/ (last visited Nov. 12, 2020).

bureau does not offer COVID-19 testing for prison staff, and at least [35] staff members are currently positive with the virus."[6] Such testing has still not been done.

Just as concerning, the BOP's failure to establish or maintain protocols appear to be a cause of the outbreaks. Just before the second outbreak occurred, BOP transferred dozens of prisoners from FCI Elkton to Fort Dix.[7]  In the spring, FCI Elkton had one of the largest outbreaks in the country, with over 900 positive cases among inmates, 54 positive cases among staff, and 9 inmates dead.[8] By October 1, 2020, the cases at both facilities seemed relatively low based on BOP's publicly available numbers: at Fort Dix, 3 positive inmates, 0 positive staff; at Elkton, 2 positive inmates, 0 positive staff.[9] Then, during October, inmates from Elkton arrived at Fort Dix.[10]

- On October 21, 2020, a memorandum to Fort Dix inmates stated that 1 person from FCI Elton had tested positive, and was isolated in unit 5851, 1st floor. A second inmate was showing symptoms. Ex. 3 at 1.

- On October 26, 2020, a memorandum to Fort Dix inmates stated that 54 cases have been isolated in unit 5851, 2nd floor. *Id.* at 2.

- On October 31, 2020, the number of positive inmate cases tripled to 165.[11]

- On January 11, 2021, at least 789 inmates were positive.[12]

---

[6] Joe Atmonavage, *Lawmakers have 'grave concerns' over how officials are handling COVID-19 outbreak at N.J. prison* (Nov. 9, 2020), https://www.nj.com/news/2020/11/lawmakers-have-grave-concerns-over-how-officials-are-handling-covid-19-outbreak-at-nj-prison.html

[7] George Woolston, *U.S. attorneys for Fort Dix ordered to detail COVID-19 response; cases at prison top 200*, (Nov. 5, 2020), https://www.burlingtoncountytimes.com/story/news/2020/11/05/fort-dix-attorneys-ordered-detail-covid-19-response-cases-top-200/6176666002/

[8] https://www.bop.gov/coronavirus/ (visited Nov. 9, 2020).

[9] BOP, COVID-19, https://www.bop.gov/coronavirus/ (from Oct. 1, 2020).

[10] Joe Atmonavage, *"I think I am going to die." Inside a coronavirus outbreak at a N.J. federal prison*, nj.com (Oct. 29, 2020).

[11] George Woolston, *Cases of COVID-19 nearly triple at FCI Fort Dix* (Oct. 31. 2020) https://www.burlingtoncountytimes.com/story/news/2020/10/31/cases-covid-19-fci-fort-dix-nearly-triple/6103081002/

[12] Briana Vannozzi, Fort Dix COVID-19 outbreak jumps with 789 inmates infected (Jan. 11, 2021), https://www.njspotlight.com/video/fort-dix-covid-19-outbreak-jumps-with-789-inmates-infected/

It is clear that the inmates were not properly tested or isolated before being transferred from Elkton to Fort Dix. In failing to take proper precautions, the BOP endangered thousands – over 2,700 inmates, hundreds of staff and contractors, and the families of those staff and contractors when the workers return home each night. With 245 positive cases currently, the outbreak is still not under control and continues to spread within Fort Dix.

Further, the living conditions at Fort Dix naturally contribute to the wild spread of the virus. Mr. Brice lives in an open floor plan with twelve people per room. There are six sets of bunkbeds, spaced three to four feet apart. The twelve men in Mr. Brice's room, however, share bathrooms with the entire floor, which houses 85 men. All 85 men share toilets, sinks, and showers, as well as the TV room and telephones. Since there are no bathroom facilities in the rooms, there is free movement along the 85 men, further adding to the spread of germs. Mr. Brice reports that the small tubes of soap provided to the men do not last the month. Mr. Brice is fortunate that he can supplement this meager supply by purchasing more through commissary but others on his floor cannot.

But it is not simply the layout of Fort Dix that makes this virus so dangerous for Mr. Brice – it's the poor management of the facility by those in charge. Even once the second outbreak started, BOP protocols appear to have been violated at every turn. While the Elkton inmates were supposed to be in a quarantine building, four inmates were reportedly removed from that building and placed in another just one week later, only to be later removed in hazmat suits.[13] Another inmate reported that he was placed back in general population for a week while awaiting his COVID-19 test results, only to find out that he was positive.[14] It is clear that Fort Dix has no preventative or proactive strategy.

---

[13] George Woolston, *U.S. Attorneys for Fort Dix ordered to detail COVID-19 response; cases at prison top 200* (Nov. 5. 2020), https://www.burlingtoncountytimes.com/story/news/2020/11/05/fort-dix-attorneys-ordered-detail-covid-19-response-cases-top-200/6176666002/

[14] Joe Atmonavage, *Reported coronavirus cases nearly triple overnight at N.J. federal Prison as outbreak continues* (Oct. 30 2020), https://www.nj.com/news/2020/10/covid-19-outbreak-at-nj-federal-prison-continues-as-reported-cases-nearly-triple-overnight.html

As of February 8, 2021, Fort Dix had given 2,518 tests, with 1,820 returning positive.[15] Fort Dix only has a total of 2,719 inmates, which means that the facility has failed to test each person even one time despite two outbreaks. This testing policy directly contradicts the CDC's recommended protocol and flouts the calls of Congress members who are concerned about the people forced to live at Fort Dix. The CDC has emphasized the importance of mass testing at regular intervals, including for staff members. Simply because an inmate tests negative one day does not mean that the person will remain virus-free. "Serial testing among quarantined contacts of infected persons in a Louisiana correctional and detention facility found a 36% positivity rate 3 days after an initial negative result, indicating that a short retest interval could improve case identification."[16] Additionally, with staff members coming in and out of the facilities on a constant basis, the health of all inmates can quickly change for the worse. "In this study, more than half of the facilities identified their first case among staff members, consistent with previous CDC findings that staff members can introduce the virus into correctional and detention environments."[17]

The abysmal positive testing rate of over 72 percent at Fort Dix underscores how the facility has avoided testing inmates. In comparison, the World Health Organization considers a 5 percent positivity rate "too high."[18] Anything above a 3 percent positivity rate in New York will force schools to start remote learning.[19] Imagine the drastic measures that cities or universities would take if their positivity rate came anywhere near 72 percent.

---

[15] https://www.bop.gov/coronavirus/

[16] *Id.*

[17] *Id.*

[18] David Dowdy and Gypsyamber D'Souza, *COVID-10 Testing: Understanding the "Percent Positive,"* Johns Hopkins Bloomberg School of Public Health (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html

[19] Allen Kim and Brian Vitagliano, *NYC schools will close after the city reached a 3% COVID positivity rate threshold*, CNN (Nov. 18, 2020), https://www.cnn.com/2020/11/18/us/nyc-schools-closed-covid-trnd/index.html

The poor management that has led to these outbreaks at Fort Dix, the refusal to test widely, and the inability of Fort Dix to adjust its procedures and protocols in accordance with scientific findings puts Mr. Brice at risk.

B.  Mr. Brice's positive COVID-19 test strengthens his claim for compassionate release.

Mr. Brice is proof of the BOP's inability to manage COVID-19. On November 1, 2020, Mr. Brice filed for compassionate release with the warden as he feared for his safety and health. Ex. 5 at 7-8. On November 20, 2020, Mr. Brice tested positive for COVID-19, after weeks of the administration at Fort Dix demonstrating that this pandemic was beyond their ability to manage. Ex. 4, at 1. His request was denied 3 days later. Initially, Mr. Brice had no symptoms. *Id.* at 2. Approximately a week after testing positive, Mr. Brice began to experience symptoms and notified medical personal during daily checks, but it does not appear that most were recorded. *Id.* at 3-15. Mr. Brice reports that he had fatigue, chills and sweats, though he never had a fever. He experienced a loss of smell and taste, which some but not all medical reports note. *Id.* Mr. Brice reports that two months later, his sense of smell has not completely returned. At the end of December, Mr. Brice returned to work, as did the rest of his floor. However, Mr. Brice and the men on his floor were not retested before their quarantine was lifted.

While all prisons are dangerous because of the nature of confinement, the fact that Mr. Brice has already contracted the virus – and there are so many other inmates at the prison who have as well – shows that the risk of reinfection is not speculative, but present and ongoing. Moreover, the continued proliferation of the pandemic within Fort Dix has not only put Mr. Brice's health directly at risk, but it has also increased the punitive nature of his sentence.

Despite already testing positive, Mr. Brice remains at risk for serious complications. Mr. Brice does not need to be reinfected with COVID-19 to become seriously ill or die from its complications. Federal prisoners Adrian Solarzano, Gerald Porter, and Robert Hague-Rogers all died

as a result of COVID-19 complications *after* BOP classified them as "recovered" or after testing negative.[20] The CDC has also clarified that infection does not even make individuals immune from reinfection.[21] And Mr. Brice is still at risk of contracting COVID-19 for a second time.[22] Reinfection with more severe symptoms has already occurred in the United States and will likely only increase as more infectious strains spread throughout the country.[23] FCI Fort Dix's history as a COVID-19 hotspot makes Mr. Brice's risk of reinfection much higher than average. This makes him a prime candidate for compassionate release.

As of February 8, 2021, the BOP reported that of the 137,329 federal inmates in BOP-managed and community-based facilities, 2,205 inmates currently have confirmed positive COVID-19 test results, 44,182 inmates have "recovered" from the disease, and 216 federal inmates have died.[24] At least 18 of these deaths occurred while the inmates' compassionate release requests were pending, and at least 6 occurred after an inmate tested negative or the BOP erroneously pronounced them "recovered."[25] The recent death of inmate Larry Bennett provides a stark warning. On

---

[20] See BOP Press Release, Inmate Death at Terminal Island (May 27, 2020), https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf; BOP Press Release, Inmate Death at FMC Lexington (July 31, 2020), https://www.bop.gov/resources/news/pdfs/20200731_press_release_lex.pdf; BOP Press Release, Inmate Death at FMC Fort Worth (Jul. 3, 2020), https://www.bop.gov/resources/news/pdfs/20200703_press_release.pdf

[21] Updated Isolation Guidance Does Not Imply Immunity to COVD-19, Center for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html (last visited September 18, 2020); *see* NATURE, Coronavirus reinfections: three questions scientists are asking at https://www.nature.com/articles/d41586-020-02506-y.

[22] *See* Angie Jackson, *State reviewing possible COVID-19 reinfections after 115 prisoners test positive twice*, Detroit Free Press, (Dec. 12, 2020), https://www.freep.com/story/news/local/michigan/2020/12/12/covid-coronavirus-reinfection-michigan-prisoners/3876185001/

[23] CDC, *New Variants of the Virus that Causes COVID-19* (Feb. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html

[24] Fed. Bur. Of Prisons, "COVID-19 Cases," https://www.bop.gov/coronavirus/ (last visited Dec. 29, 2020)

[25] Justin Wm. Moyer and Neena Satija, *Frail inmates could be sent home to prevent the spread of covid-19. Instead, some are dying in federal prisons*, The Washington Post (Aug. 3, 2020),

December 21, 2020, the BOP reported Mr. Bennett's death after he tested positive in early

December 2020.[26] Mr. Bennett tested positive for COVID-19 on December 2, 2020, while in BOP

custody, and he was placed in medical isolation. *Id.* Ten days later, Mr. Bennet was transported to a

local hospital after experiencing shortness of breath, high heart rate, high blood pressure, and low

oxygen levels. Sadly, within a week of being taken to the hospital with these symptoms, Mr. Bennet

died. *Id.*

      Inmates who have tested positive for COVID-19 are at risk for serious medical conditions,

and even death, while remaining in custody.[27] Courts have recognized this risk in granting

compassionate release to defendants who have already tested positive for COVID-19.[28] In *United*

https://www.washingtonpost.com/local/public-safety/frail-inmates-could-be-sent-home-to-prevent-the-spread-of-covid-19-instead-some-are-dying-in-federal-prisons/2020/08/02/992fd484-b636-11ea-9b0f-c797548c1154story.html ; Fed. Bur. of Prisons, "Inmate Death at FCI Lompoc," (Dec. 18, 2020),
https://www.bop.gov/resources/news/pdfs/20201217pressreleaselom.pdf ; Fed. Bur. of Prisons, "Inmate Death at FCI Butner," (Sept. 17, 2020),
https://www.bop.gov/resources/news/pdfs/20200917pressreleasebux.pdf ; Fed. Bur. of Prisons, "Inmate Death at FMC Carswell," (Aug. 26, 2020),
https://www.bop.gov/resources/news/pdfs/20200826pressreleasecrw.pdf ; Fed. Bur. of Prisons, "Inmate Death at FMC Lexington," (July 31, 2020),
https://www.bop.gov/resources/news/pdfs/20200731pressreleaselex.pdf ; Fed. Bur. of Prisons, "Inmate Death at FMC Fort Worth," (July 3, 2020),
https://www.bop.gov/resources/news/pdfs/20200703pressrelease.pdf ; Fed. Bur. of Prisons, "Inmate Death at the FCI Terminal Island," (May 27, 2020),
https://www.bop.gov/resources/news/pdfs/20200527pressreleasetrm.pdf .

    [26] Fed. Bur. of Prisons, "Inmate Death at FCI Memphis" (Dec. 21, 2020),
https://www.bop.gov/resources/news/pdfs/20201221pressreleasemembennett.pdf

    [27] Fed. Bur. of Prisons, "Inmate Death at FCI Butner," (Sept. 17, 2020),
https://www.bop.gov/resources/news/pdfs/20200917pressreleasebux.pdf ; Fed. Bur. of Prisons, "Inmate Death at FCI Lompoc," (Dec. 18, 2020),
https://www.bop.gov/resources/news/pdfs/20201217pressreleaselom.pdf

    [28]*See e.g., United States v. Carlson*, 2020 WL 6561807 (W.D. Wash. Nov. 9, 2020) (granting compassionate relief to inmate who suffers from heart failure, Type 2 diabetes mellitus, and obesity, and contracted COVID-19); *United States v. Jones*, No. 1:15-cr-279-RBJ, Dkt. No. 88 at 3 (D. Colo. Nov. 5, 2020) (granting compassionate release to inmate who suffers from kidney disease, congestive heart failure, hypertension, and coronary artery disease, and contracted COVID-19); *United States v. Nazario*, No. 3:16-cr-186-VLB, Dkt. No. 510 at 7-8 (D. Conn. Oct. 21, 2020) (granting compassionate release to inmate at Wyatt Detention Center who suffers from obesity, breathing problems and high blood pressure, and contracted COVID-19); *United States v. Fernandez*, No. 2:16-CR-00115-KJM, 2020 WL 5909490, at *4 (E.D. Cal. Oct. 6, 2020) (granting compassionate release to inmate at FCI Lompoc who suffers from chronic kidney disease, obesity, asthma, and hypertension, and contracted COVID-19); *United States v. Sarac*, No. 2:18-cr-00036-RFB-

*States v. Braxton*, the Court found that "contracting COVID-19 increased the severity of [inmate's] sentence beyond what was originally anticipated, and itself weighs in favor of a finding of extraordinary and compelling reasons." No. 1:09-cr-00478-JKB, 2020 WL 4748536, at *3 (D. Md. Aug. 17, 2020) (internal quotation marks and brackets omitted); *see also United States v. Lee*, No. 1:95-cr-00058-LMB, Dkt. No. 46 at 5, 8 (E.D. Va. June 22, 2020) (granting compassionate release to 46-year-old defendant at D.C. jail who tested positive for COVID-19); *United States v. Kess*, No. 1:14-cr-00480-ELH, Dkt. No. 57 at 11-13 (D. Md. June 17, 2020) (granting compassionate release to 42-year-old defendant at FCI Lompoc who tested positive for COVID-19); *United States v. Williams*, No. 8:19-cr-00134-PWG, Dkt. No. 70 at 9 (D. Md. June 10, 2020) (granting compassionate release to 41-year-old defendant at D.C. Correctional Treatment Facility who tested positive for COVID-19); *United States v. Hayes*, No. 9:10-cr-00812-DCN, Dkt. No. 97 at 10 (D.S.C. Aug. 27, 2020) (granting compassionate release to inmate at FMC Lexington with medical issues who contracted COVID-19); *United States v. Heyward*, No. 8:17-cr-00527-PWG, Dkt. No. 83 at 2-7 (D. Md. June 30, 2020) (granting compassionate release to 65-year-old defendant at FMC Lexington who tested positive for COVID-19).

In *Braxton*, the court found that the inmate who had tested positive for COVID-19 did not even need to be "among the group of inmates with the very highest risk of severe illness or death."

---

PAL, Dkt. No. 66 at 2 (D. Nev. Sept. 25, 2020) (granting compassionate release to inmate in USMS custody at Nevada Southern Detention Center who suffers from obesity, asthma, and epilepsy, and contracted COVID-19); *United States v. Davidson*, No. 2:16-CR-00139-2, 2020 WL 4877255, at *20 (W.D. Pa. Aug. 20, 2020) (granting compassionate release to inmate at FMC Lexington who suffers from chronic kidney disease, diabetes, chronic pain, diabetic peripheral neuropathy, staph infection, hypertension, and elevated cholesterol levels, and contracted COVID-19); *United States v. Armstrong*, No. 3:18-cr-05108-BAS, Dkt. No. 45 at 6 (S.D. Cal. July 30, 2020) (granting compassionate release to 54-year-old inmate at FCI Terminal Island who suffers from hypertension, hyperlipidemia, type 2 diabetes, and obesity, and contracted COVID-19); *United States v. Reynolds*, No. 2:18-cr-00131-RAJ, Dkt. No. 1365 (W.D. Was. July 23, 2020) (granting compassionate release on reconsideration to inmate at FCI Lompoc who suffers from stage 2 kidney disease, obesity, and heart disease, and contracted COVID-19); *United States v. Davis*, No. 2:06-CR-20020-SEM, ECF No. 337 (C.D. Ill. July 20, 2020); *United States v. Fletcher*, No. 8:05-CR00179-TDC, ECF No. 856 (D. Md. July 13, 2020).

12

*Braxton*, at *3. Instead, the court looked to the "totality of the circumstances" to conclude that the dual presence of the inmate's "vulnerability and the fact that he has already contracted the virus…presents extraordinary and compelling reasons for sentence reduction." *Braxton*, at *3. Further, courts have granted compassionate release for COVID-19 positive inmates in recognition of the fact that those who have contracted COVID-19 are not guaranteed immunity from a successive infection. *United States v. Fletcher*, No. 8:05-cr-00179-TDC, Dkt No. 856 (E.D. Va. July 13, 2020) (granting compassionate release to 65-year-old inmate at FCI Elkton who tested positive for COVID-19); *United States v. Easton*, No. 1:18-cr-22-RLW, Dkt. No. 64 at 5 (E.D. Mo. Nov. 10, 2020) (granting compassionate release to inmate at USP Marion with medical issues who contracted COVID-19).

C. Mr. Brice's medical conditions continue to put him at risk of COVID-19.

Particularly with new strains of COVID-19 appearing and spreading across the globe, Mr. Brice remains at risk of reinfection. The CDC states that the United Kingdom variant "may be associated with an increased risk of death compared to other variant viruses" and that the Brazil variant "contains a set of additional mutations that may affect its ability to be recognized by antibodies."[29] Mr. Brice is far from out of harm's way.

With Mr. Brice's hypertension and a body mass index (BMI) over 25, Mr. Brice remains at risk for reinfection.[30] While he has been relatively fortunate to not experience severe symptoms during his first infection, that does not in any way indicate that he will be so fortunate if reinfected.

---

[29] CDC, *New Variants of the Virus that Causes COVID-19* (Feb. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html

[30] Mr. Brice also suffers from other medical conditions, including: glaucoma, anemia, and depression and anxiety. Ex. 4 at 16-17. He receives medication for his glaucoma and depression/anxiety. *Id.* at 18-19.

Hypertension occurs when the "force of the blood" against the artery walls is high enough that it may cause health problems including heart disease.[31] The more blood the heart pumps and the narrower the arteries, the higher a person's blood pressure, which damages blood vessels.[32] Mr. Brice's hypertension began in 2012, and he currently takes two medications to help manage it: propranolol and lisinopril. Ex. 4 at 19.

Medical data establishes in no uncertain terms the increased risk that Mr. Brice faces because of his serious underlying health conditions. A recent study of adults hospitalized for COVID-19 revealed that 89.3 percent had one or more underlying conditions, the most common being hypertension (49.7 percent).[33] Studies have also found that the fatality rate is markedly higher among people suffering from these underlying conditions. Out of 5,700 patients hospitalized for COVID-19 in New York City, 21 percent died; the most common risk factors were **hypertension**, obesity, and diabetes.[34] A meta-analysis showed that a "history of hypertension was common among those who had severe, as compared with nonsevere, COVID-19."[35] In a study of "1590 hospitalized patients in China, underlying hypertension was independently associated with severe COVID-19."[36]

---

[31] Mayo Clinic, *High blood pressure (hypertension)*, available at: https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410

[32] *Id.*

[33] Garg S, Kim L, Whitaker M, *et al.*, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, 69 MMWR Morb. Mortal Wkly. Rep., 458–464 (2020), http://dx.doi.org/10.15585/mmwr.mm6915e3external icon.

[34] Richardson S, Hirsch JS, Narasimhan M, *et al. Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area,* JAMA (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184.

[35] Paul M. Palevsky, M.D., *et. al, Coronavirus disease 2019 (Covid-19): Issues related to kidney disease and hypertension*, UpToDate (last updated Jun. 16, 2020), available at: https://www.uptodate.com/contents/coronavirus-disease-2019-covid-19-issues-related-to-kidney-disease-and-hypertension

[36] *Id.*

To add to the cardiac and COVID-19-related dangers, Mr. Brice also suffers from hyperlipidemia, which occurs when plaque accumulates along the walls of the arteries and makes it difficult for blood to flow through.[37] *Id.* at 14. This can affect a person's blood pressure because it narrows the arteries, further exacerbating Mr. Brice pre-existing hypertension.

Additionally, the CDC found that a person with a body mass index (BMI) of over 25 but less than 30 might be at increased risk from severe illness from COVID-19.[38] Like most people, Mr. Brice's weight has fluctuated over the years, with his BMI ranging between 24 and 27.9. *Id.* at 17. Using his most recent weight available, his BMI is 25.4.[39] *Id.* at 25.

This triad of hypertension, hyperlipidemia, and BMI over 25 is especially worrisome because these conditions essentially feed off each other to worsen the overall condition of the patient. Here, the totality of circumstances weighs towards granting compassionate relief for Mr. Brice due to his COVID-19 infection and his continued health risks from COVID-19.

## V. Mr. Brice's release adheres to the § 3553(a) sentencing factors.

In evaluating a motion for compassionate release, the Court must consider "the factors set forth in section 3553(a)" to "the extent that they are applicable" to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A). In light of *McCoy*, a court in this District has found that whether a defendant is a danger to the community is no longer a standalone factor for the Court to consider. *Williams*, Case No. 1:92cr83, Dkt. No. 349 at 7, n.3. That is because this factor was promulgated by a sentencing guideline that no longer governs motions for compassionate

---

[37] Mayo Clinic, *High Cholesterol*, available at: https://www.mayoclinic.org/diseases-conditions/high-blood-cholesterol/symptoms-causes/syc-20350800

[38] CDC, *People with Certain Medical Conditions,* available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions

[39] From medical records, Mr. Brice is 77 inches tall and last weighed 214 pounds, for a BMI of 25.4. For BMI calculator, see https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

release. *Id.* "Moreover, the compassionate release statute's directive that courts consider, when relevant, the extent to which a sentence reduction adequately 'protects the public from further crimes of the defendant' subsumes a freestanding inquiry into the Defendant's danger to the community." *Id.* (citing 18 U.S.C. § 3582(c)(1)(A); 18 U.S.C. § 3553(a)(2)(C)). Weighing all the factors set forth in § 3553(a), and considering Mr. Brice as he stands before the Court today, warrants a reduction of his sentence.

A. <u>Mr. Brice is not a danger, and application of the other sentencing factors weighs in favor of compassionate release.</u>

If released, Mr. Brice would not pose a danger to the community. After factoring in good-time credit, he has served over half of his sentence. Having been incarcerated since 2006, Mr. Brice has now spent over 14 years—from ages 27 to 41—behind bars. During this time in prison, Mr. Brice started on his path to rehabilitation immediately and has made the most of his incarceration. In 2008, he earned his GED. Ex. 5 at 1. In 2009, he completed a course in rational behavioral therapy, which he continued to build on with additional classes in 2010 and 2011. *Id.* at 2. Also in 2009, he completed classes in computer keyboarding, business marketing, business essentials, project management, and rental properties. *Id.* He also took a CDL class for future employment prospects, and signed up for sex offender treatment and was placed on the waitlist.[40] *Id.* at 2, 6. In 2010, he built on these foundational classes by continuing courses in computers, Microsoft Excel, keyboarding, and real estate, as well as leisure reading and anger management. *Id.* at 2. He also completed a drug education class and the nonresidential drug program. *Id.* As the years progressed, Mr. Brice's classes became more advanced as well, including taking a "tech math" class in 2015 and introduction to precalculus theory in 2016. *Id.* at 1.

---

[40] Mr. Brice remains on the waitlist, though Fort Dix is not a provider of this treatment. Ex. 5 at 6.

In 2015, he began his apprenticeship through Unicor in quality control inspection, which he completed. *Id.* Mr. Brice reports that completing the apprenticeship required 4000 hours in Unicor, and he fulfilled more than that as he waited for certain classes to become available. Mr. Brice's participation in the Unicor program is itself notable and reflects rehabilitation. As the BOP's website explains:[41]

> UNICOR is first and foremost a correctional program. The impetus behind FPI is not about business, but rather inmate release preparation. UNICOR assists offenders with acquiring marketable job skills so that they can one day become law-abiding, contributing members of society. The production of items and provision of services are merely by-products of those efforts.

Only 8 percent of work-eligible inmates are selected to participate in the UNICOR program, with 25,000 inmates "waiting to work in UNICOR." The benefits of working in UNICOR are well-documented: inmates are 24 percent less likely to recidivate and 14 percent more likely to find and maintain employment.[42]

Mr. Brice typically works five days per week in quality assurance, inspecting textiles for the Army, specifically shorts and pants for military members. He works on an open floor in the factory and walks throughout the floor inspecting the work of others in the factory. Typically, Mr. Brice works with men who live on three different floors. Currently, two of those housing floors remain quarantined so he is only supervising those who live on the same floor as him. However, once the quarantine for those two floors is over, he will have regular contact with people beyond those he lives with.

Notably, BOP places Mr. Brice in a low-security classification level and a low risk of recidivism. *Id.* at 5. Although Mr. Brice was sentenced for a serious offense, there is no way the

---

[41] BOP, *UNICOR Program Details*, https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp

[42] *Id.*

Court could have contemplated that Mr. Brice's life would be acutely in danger as a result of the proliferation of the COVID-19 virus within federal prisons. Courts have agreed that "although [a] defendant's federal sentence may have been appropriate at the time it was imposed, the Court's analysis is different in current circumstances." *United States v. Lee*, 2020 WL 3422772, at *5 (E.D. Va. June 22, 2020); *see also United States v. Mel*, 2020 WL 2041674 at *3 (D.Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."); *United States v. Amarrah*, 2020 WL 2220008 at *6 (E.D. Mich. May 7, 2020) ("The Court sentenced Defendant to 60 months in prison; it did not sentence him to death or to incarceration that carries a significant risk of death.").

B. Mr. Brice has a safe and viable release plan.

If released, Mr. Brice plans to live with his mother, Madelaine Montgomery, and her family in Chesapeake, Virginia.[43] Ms. Montgomery is 66 years old, is retired, and has no criminal history. She lives with her sister and brother-in-law, Patricia and John Muth. Mr. and Mrs. Muth are 74 and 78 years old respectively, both retired, and neither have a criminal history. They live in a 3-bedroom, 2-bathroom home owned by Mr. and Mrs. Muth. If released, Mr. Brice could quarantine in one of the bedrooms and bathrooms.

Ms. Montgomery and Mr. Muth each contracted COVID-19 separately and both were asymptomatic. Ms. Montgomery contracted COVID-19 after a recent surgery while she was in a rehabilitation center to help her regain mobility. She is back in the home, but is currently using a wheelchair.

---

[43] The proposed release plan has been verified by Susan Harrison Jones, investigator at the Federal Public Defender's Office. Ms. Jones spoke to Mr. Brice's mother, Madelaine Montgomery, and to Mr. Brice's aunt, Patricia Muth.

Ms. Montgomery and the Muths are able to provide emotional and financial support to Mr. Brice. Ms. Montgomery confirms that Mr. Brice could use her vehicle to travel to work and the probation office.

Upon release, Mr. Brice would also be subject to strict oversight by the probation office. He has lifetime supervision; he would have no access to technology without monitoring or without permission from the probation office; he would have to comply with the SORNA requirements and he would participate in sex offender treatment including polygraphs. Granting compassionate release would allow Mr. Brice to receive the necessary treatment after being punished for over 14 years. This Court may also impose home confinement as an additional punishment and as another way to monitor Mr. Brice.

Lastly, this Court and others around the country have granted compassionate release to defendants with similar serious convictions. *United States v. Geister*, No. 2:10cr127-AWA, ECF No. 52, at 7 (E.D. Va. Aug. 14, 2020) (granting compassionate release to defendant with child-pornography convictions, noting that requiring defendant to "serve out the remaining months of his sentence at Fort Dix would accomplish little" since the facility has no sex offender treatment program); *United States v. Amaro*, No. 16cr848 (KPF), 2020 WL 3975486, at *3 (S.D.N.Y. July 14, 2020) (granting motion for compassionate release for 32-year-old defendant convicted of child-pornography offenses, finding that the lack of sex-offender and mental-health treatment at Fort Dix would go against "the gains that [defendant] has made while incarcerated"); *United States v. Adam Field*, No. 18 Cr. 426 (JPO), Dkt. No. 38 (S.D.N.Y. May 4, 2020) (granting compassionate release to defendant with child-pornography convictions who had hypertension and "nonphysical health conditions"); *United States v. Ratliff*, 3:13cr91 (D. Nev. July 14, 2020) (granting compassionate release to defendant with child-pornography convictions who had similar prior offense, and finding that conditions of supervised release would prevent recidivism); *United States v. Dillard*, Case No. 1:15-cr-

170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020) (53-year-old with health problems granted compassionate release after serving approximately half of 87-month sentence for second federal child pornography offense).

## CONCLUSION

For the reasons above, Mr. Brice respectfully requests that this Court order his immediate compassionate release.

Respectfully submitted,

CHARLES LEE BRICE

By: _____/s/_____
    Lindsay J. McCaslin
    Virginia State Bar No. 78800
    Attorney for Charles Brice
    Assistant Federal Public Defender
    Office of the Federal Public Defender
    150 Boush Street, Suite 403
    Norfolk, Virginia 23510
    Telephone: 757-457-0800
    Facsimile: 757-457-0880
    lindsay_mccaslin@fd.org

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 9th day of February 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to ECF users.

I further certify that on the same day, I sent the foregoing Motion via electronic mail to the following non-filing user:

United States Probation Office
duty-vaep-norfolk@vaep.uscourts.gov

_____/s/_____

Lindsay J. McCaslin
Virginia State Bar No. 78800
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0800
Facsimile: 757-457-0880
lindsay_mccaslin@fd.org